IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

MAUREEN S. GALLOPS,                    )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CV-96-PT-0056-E
                                       )
AVONDALE MILLS, INC.,                  )
                                       )
        Defendant.                     )

**ENTERED**

JAN 2 9 1997

## MEMORANDUM OPINION

This action comes on to be heard on the defendant's Motion for Summary

Judgment filed on October 28, 1996.

### BACKGROUND

Avondale Mills (Avondale), a textile manufacturer that produces yarns and fabrics, hired

Maureen S. Gallops (Gallops) in December 1968. Avondale owns and operates facilities across

the United States. Gallops worked in the Design Department at the Sylacauga, Alabama facility.

Initially, Gallops began work as a Designer in Avondale's "Shirting" area. In 1971, however,

Avondale eliminated Gallops' position and she became a Designer in Avondale's "Bottom Weight

Fabrics" area.

Gallops continued to work in this job until 1979 when Avondale named her a Coordinator

for "Home Fashions." In 1981, Avondale discontinued the home furnishings area of its business

and eliminated Gallops' position. Gallops then transferred to Avondale's "Fabric Development"

area for the next two years until becoming a "Designer" or "Stylist" in the Design Department.

Gallops remained in this job from 1983 until 1995 (until she was 55 years old) when Avondale

1

ended her employment.

Certain events are at issue here that occurred primarily between 1994 and 1995. The first incident happened in 1994 when Avondale hired a younger female, Lydia Caffery, to be Director of Marketing Services and, consequently, Gallops' supervisor. The second incident occurred in January 1995 when Avondale eliminated the Sylacauga Stylist Position that Gallops held. The third incident followed shortly afterwards when Avondale named another younger female, Marion Testa, as Manager of the Design Department. The final incident happened when Avondale moved Gallops' position as Pattern Technician from Sylacauga to New York.

## CONTENTIONS

### I. AGE DISCRIMINATION

### 1. Director of Marketing Services Position

In May 1994, Avondale hired Lydia Caffery (Caffery) as the company's newly established Director of Marketing Services. Gallops contends that Avondale named Caffery rather than Gallops to this position because Gallops was the older of the two. As support for this contention, Gallops claims that Caffery had no training or experience as a designer, stylist, or technical assistant in the mill industry. Instead, Gallops claims, Caffery's experience was in marketing for the fashion industry.[1] Moreover, Gallops asserts that Avondale never posted nor discussed the new position with her before naming Caffery. She notes that John Hudson, Jr., Avondale's vice-president of Merchandising, forwarded a memo stating that his hiring goal was a "Kathy Barton

---

[1] The court notes that the job title is "Director of Marketing Services."

2

type person" - another female in her thirties.[2]

Avondale argues that this claim is time-barred pursuant to 29 U.S.C. § 626(d)(1) because the company hired Caffery in May 1994 and Gallops did not file an EEOC charge until February 1, 1995 - past the 180-day time limit. Avondale next contends that Gallops' prima facie case fails because she was unqualified for the position. As support, Keith Hull, President of the Fabric's Division, testified that Gallops told him that "she had neither the desire nor the skills required to manage people."[3] Avondale also claims that Gallops disagreed with Hull's managerial style because she viewed his style as "micro-management" and "dictatorial." Moreover, it argues that Gallops failed to identify and present competent evidence that she otherwise possessed the managerial skills necessary for the position.

Gallops, in turn, contends that Avondale's legitimate, nondiscriminatory reasons are a pretext for unlawful discrimination. Gallops denies stating that she had "neither the desire nor the skills required to manage people" but instead claims that she told Hull that she preferred to manage people differently than he - in a "hands-on, supportive and tutorial" approach.[4] Moreover, Gallops claims that she has managerial skills gained from supervising co-workers and interns. As evidence of her abilities, George Smith, the former President of the Fabrics Division, testified that he: ". . . [did] not recall [Gallops] having employee supervisory responsibilities per se. However, [Gallops] did demonstrate the skills necessary for such a supervisory roll [sic], but

---

[2] Gallops also submits Michael Rickman's affidavit, Hudson's then-supervisor, wherein Rickman states that Hudson once said: "We need to hire some young, pretty women to travel with."

[3] Declaration of Keith Hull.

[4] Affidavit of Maureen Gallops, p.8.

3

the organizational structure was such that the opportunity never occurred."[5]

## 2. The Sylacauga Stylist Position

Gallops contends that in January 1995 Avondale demoted her from the Designer/Stylist position that she held for 27 years to a Pattern Technician job. After which, Gallops claims, Avondale no longer allowed her to have direct client contact, travel, or make presentations, and reduced her salary by $10,000. Despite her protests over the move, Gallops asserts, Hudson, Caffery, and Hull told her that she could do nothing about the situation.[6] Under protest, Gallops signed-off on her new job description specifically noting that the "demotion" was an "illegal demotion in position and salary based on age discrimination."

Avondale contends, however, that the company based its decision to eliminate the Sylacauga Stylist position on a legitimate business determination. Specifically, Avondale claims that Caffery sought to create accountability and increase efficiency and productivity in the Design Department. Caffery asserts that her assessment revealed an overlap of duties that led to unnecessary duplication of efforts by the design staff. This assessment also revealed irresponsibility toward specific clients and projects because multiple stylists worked on various aspects of the design process causing certain design steps to "[fall] through the cracks"[7] because no one person was accountable. Avondale also claims that the company did not distribute work evenly within the Design Department and that an overall lack of communication and organization

---

[5] Affidavit of George Smith, p.2-3.

[6] Gallops alleges that Hudson told her to sign her new job description because "Avondale was like a communist country - they could do anything they wanted." Affidavit of Maureen Gallops, p.2.

[7] Caffery Declaration.

existed.

To eliminate these problems, Avondale contends, Caffery proposed centralizing the department's research and design aspects in a single location. Avondale's asserted reasons for choosing New York were: (1) virtually the entire design staff was already in New York; (2) the computer assisted design equipment was in New York; (3) New York presented more travel options, and (4) New York was an existing fashion center. Avondale asserts that the company adopted Caffery's proposal and thus eliminated the Sylacauga Stylist position that Gallops held.

Further, with the design functions centralized in New York, Avondale contends, the company needed a technical, design link between the New York group and the mills around Sylacauga. Caffery thus proposed creating a Pattern Technician position to ensure that the mills properly implemented the design ideas and produced quality products. Caffery allegedly wanted Gallops to fill the new position because of Gallops' talent in the technical area. Hull allegedly approved Caffery's plan contingent on salaries reflecting significant responsibility changes. Avondale claims that Hull determined that the Pattern Technician job could be filled in the $25,000 to $30,000 salary range based on market realities and the more limited responsibilities required by the position. The company claims that it offered Gallops $45,000, however, because of her experience and tenure with Avondale.

Gallops, in turn, contends that Avondale's alleged legitimate, nondiscriminatory reasons for these actions are a pretext for unlawful discrimination. As evidence of the pretext, Gallops cites Caffery's deposition testimony in which she stated a more general reason for the decision to

5

eliminate the Sylacauga Stylist position than given later in her affidavit.[8]  Moreover, Gallops

claims that Caffery made a "quantum leap" in believing that removing Gallops from the Stylist

position would accomplish her stated goals.  Gallops also notes some perceived inconsistencies

between Caffery's version of Gallops' employment history and her actual history.  Lastly, Gallops

claims that Caffery lacked knowledge of Stylists' actual responsibilities and ignored former

supervisors' excellent reviews of Gallops.

### 3. The Design Manager Position

Gallops also contends that Avondale's motivation in naming Marion Testa as Manager of

the Design Department was also age-based because Testa, in her thirties, was younger than

Gallops.  Gallops argues that Avondale never offered her the job nor discussed the job with her.

This fact disturbed Gallops because she had greater experience, knowledge, national awards, and

recognition than Testa.  Moreover, Gallops noted that she trained Testa, a former secretary, to

become a designer.  Gallops also challenges Caffery's stated reasons for hiring Testa as

questionable grounds upon which to base a hiring decision.[9]

Avondale contends, however, that Gallops cannot show her qualifications for the manager

position and, as such, cannot establish her prima facie case.  The company admits that Gallops

---

[8] In response to a question asking what was the basis of changing Gallops' job title and responsibilities, Caffery stated, "I had reorganized the department and I had made the crucial decision that [Gallops'] strengths really lay in the technical area of the business rather than the creative.  And this was in an attempt to strengthen the department as a whole."  Deposition of Lydia Caffery Wilbanks, p.152.  Then Caffery was asked how such a move would strengthen the department and she stated, "Because it made the job title reflect exactly what was being done in the job."  p.152.  The court notes that these statements are not significantly inconsistent with the affidavit, just not as complete a recitation.

[9] Gallops quotes testimony by Caffery that she "spent a lot of time with [Testa], had worked with her, traveled with her and supervised her" and thought Testa could "talk the talk."

6

may have supervised other employees at times but argues that she did not possess the managerial skills necessary for the Design Manager position. Moreover, Avondale again claims that Gallops told Keith Hull, President of the Fabrics Division, that she "had neither the desire nor the skills required to manage people." In view of this alleged comment, coupled with Avondale's perception that Gallops lacked managerial skills, the company maintains that it properly refused to consider Gallops for the position.

Gallops again contends that Avondale's legitimate, nondiscriminatory reasons for not promoting her to the Design Manager position are a pretext to cover age discrimination. Gallops denies making the alleged comment to Hull and states that she simply meant that she manages differently than Hull. Significant, Gallops claims, is Caffery's contention that she only considered the existing New York staff because they were already established in New York. Gallops questions this reason because Caffery considered Gallops for a lower-paying, technical position in New York just months later. Lastly, Gallops challenges Caffery's perception that Gallops was unqualified because she claims that Caffery knew nothing about Gallops' background and experience before hiring Testa.[10]

### 4. Retaliation

In January 1995[11], Gallops filed an EEOC charge of age and sex discrimination because Avondale did not consider her for the Design Manager job and for moving her to the Pattern Technician job. Subsequently, in December 1995, John Hudson, Jr. and Caffery told Gallops that

---

[10] Gallops also claims that Caffery knew nothing about Testa's background and experience.

[11] Gallops EEOC charge lists the date as 01-18-95. In its brief, Avondale incorrectly states that the date was February 1995.

the company planned to transfer the Pattern Technician job to New York with a salary of $55,000.[12] Gallops claims that Caffery and Hudson gave her two options if she could not move to New York: (1) to work as a Shift Manager in the Grading and Packaging Plant on twelve hour shifts for $30,000; or (2) to work as a technician in the Dye Lab for nine dollars an hour. Gallops claims that Avondale planned to end her employment on December 31, 1995 if she chose neither option. Afterwards, on December 31, 1995, Avondale terminated Gallops.

Again, Avondale contends that the company had a legitimate, nondiscriminatory reason for moving the Pattern Technician job to New York. Avondale notes that Gallops spent a significant portion of her work-time as Pattern Technician traveling to Russell Mills in Alexander City, Alabama to review prints. In October 1994, however, Russell Mills notified Avondale that Russell planned to cease its print business. Avondale claims that this development required its selection of Brittany Mills in New Bedford, Massachusetts to do its print work.

After these events, Avondale contends that the company decided to transfer the Pattern Technician job to New York. The company thought that if Gallops moved to New York she could assume some technical duties already done in the New York office and would be close to the new printer, thereby increasing efficiency. Initially, the company claims that it offered Gallops a $5,000 raise to $50,000 to move to New York. After Gallops requested more money, Avondale states that it offered an additional $5,000 that would have made Gallops the highest paid member of the New York design staff. Gallops, however, did not accept the offer and Avondale terminated her on December 31, 1995.

Gallops contends that Avondale's legitimate reasons are merit-less and based on factually

---

[12] Initially the company offered $50,000.

8

incorrect information. In essence, Gallops argues that she could have continued to do her Pattern Technician duties from Sylacauga despite the change in printers. Moreover, Gallops claims that Caffery poorly researched the transfer before implementing the change. Further, Gallops contends that Avondale's offer of alternative jobs was "simply and [sic] empty gesture"[13] because the company knew Gallops would not accept either position.

## LEGAL STANDARD

On a motion for summary judgment, the court must assess the proof to see whether there is a genuine need for trial. Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. V. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial.

---

[13] Citing Batey v. Stone, 24 F.3d 1330 (11th Cir. 1994).

9

Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any . . . "
in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c).
In making the determination of whether a given factual dispute requires submission to a
jury, the court must view the presented evidence through the prism of the substantive
evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid
weighing conflicting evidence or making credibility determinations. Welch v. Celotex
Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

Considering the above, this court must examine the evidence to decide if there
exists a genuine issue of material fact.

## ANALYSIS

### I. AGE DISCRIMINATION

A plaintiff can prove intentional discrimination by either direct or circumstantial
evidence. When a plaintiff's evidence is circumstantial, the Supreme Court has developed a
framework for pursuing the inquiry. See McDonnell Douglas Corp. v. Green, 411 U.S. 792,
93 S. Ct. 1817, 36 L. Ed.2d 668 (1973); Texas Department of Community Affairs v. Burdine,
450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed.2d 207 (1981). This loose framework has evolved
into three stages. First, the plaintiff must create an inference of discrimination by establishing
a prima facie case by a preponderance of the evidence. Second, once the plaintiff establishes a
prima facie case, the burden of production shifts to the defendant to rebut the presumption of

10

intentional discrimination by articulating legitimate, nondiscriminatory reasons for the employment action. Third, the plaintiff must have an opportunity to show by a preponderance of the evidence that the defendant's stated reasons are pretexts for discrimination and to present other evidence of discriminatory intent.

A court should not apply this McDonnell Douglas-Burdine burden shifting analysis in a way that is "'rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" U.S. Postal Service Board of Governers v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed.2d 403 (1983), quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed.2d 957 (1978).

### 1. The Director of Marketing Services Position

The ADEA, as with other employment discrimination statutes, contains its own limitation period relating to the filing of EEOC charges. 29 U.S.C. § 626(d)-(d)(1) provides in pertinent part:

> No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed -
> (1) within 180 days after the alleged unlawful practice occurred
> . . .

The charging period of the ADEA, however, is subject to equitable modification. Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023 (11th Cir. 1994). Under equitable modification, a limitations period does not start to run until the facts that would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent

11

regard for his rights.  Sturniolo, 15 F.3d at 1025.

The uncontroverted evidence establishes that Avondale selected Caffery as its new Director of Marketing Services in the spring of 1994 and Caffery began working in May of that year.  Gallops waited, however, more than 180 days until January 1995 to file her charge of discrimination with the EEOC.  Gallops fails to either explain why she waited so long to file her charge or to justify the delay.

Limitation periods such as the present one are enacted to notify employers who can promptly and efficiently attempt to resolve disputes with its employees.  Employees therefore benefit because, at a minimum, the employer is notified and can attempt to prevent similar actions in the future.  In turn, the court system benefits when aggrieved employees do not inundate dockets with controversies that employers could otherwise dispose of early-on in a mutually agreeable manner.

Gallops knew of her possible rights, or reasonably should have known of her possible rights under the ADEA on the date that Caffery assumed her duties as Director of Marketing Services.  No evidence exists that warrants the court's narrow equitable power to modify the limitations period and Gallops fails to argue any justification.  The court concludes, therefore, that Gallops' claim based on the Director of Marketing position is untimely and is thus barred. Accordingly, summary judgment will be granted on this claim.[14]

### 2. Events of January 1995

Gallop's other claim results from the events that took place in January 1995.  Within

---

[14] In a phone conference on January 23, 1997 the plaintiff acknowledged that the claim was time-barred.

that month, Avondale created the Design Manager position in New York, eliminated Gallops'

Sylacauga Stylist position, created a Pattern Technician position for her, and named Marion

Testa as the Design Manager in New York. Avondale would have this court treat each event

as distinct from the other. Considering the strong policy concerns to end employment

discrimination, however, the court must review the totality of the circumstances. See, e.g.,

Faragher v. City of Boca Raton, 76 F.3d 1155 (11th Cir. 1996).

As Gallops attempts to prove age discrimination with circumstantial evidence, she

must follow the four-part burden shifting test. Generally, a plaintiff must show the following

to establish a prima facie case of age discrimination: (1) that she belongs to a protected class;

(2) that she was subject to an adverse employment decision;[15] (3) that she was replaced with a

person outside the protected group; and (4) that she was qualified to do the job. Clark v.

Coats and Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1992). The Eleventh Circuit, however,

has repeatedly eschewed a strict formulation of the elements of a prima facie case, especially

in age discrimination cases.[16] Presentation of a prima facie case by a plaintiff raises a

rebuttable inference of discrimination and shifts the burden of proof to the employer to

respond with a legitimate, nondiscriminatory reason for dismissing the plaintiff. Carter v. City

of Miami, 870 F.2d 578, 584 (11th Cir. 1989).

Once an employer proffers a legitimate, nondiscriminatory reason for an employment

action, the burden returns to the plaintiff to prove by significantly probative evidence that the

---

[15] That is, the plaintiff was discharged, demoted, not hired, etc.

[16] "Age, unlike race or sex, is not a discrete and immutable characteristic of an employee which separates the members of the protected group indelibly from persons outside the protected group. Rather, age is a continuum along which the distinctions between employees are often subtle and relative ones." Carter v. City of Miami, 870 F.2d 578, 583 (11th Cir. 1989).

13

proffered reason is a pretext for discrimination. <u>Isenbergh v. Knight-Ridder Newspaper,</u> 97

F.3d 436, 444 (11th Cir. 1996). Absent significantly probative evidence, summary judgment

will be granted. <u>Isenbergh,</u> 97 F.3d at 444. Conclusory allegations of discrimination, without

more, are insufficient to raise an inference of pretext or intentional discrimination where the

employer offers extensive evidence of legitimate, nondiscriminatory reasons for its actions.

<u>Id</u>.

Gallops attempts to meet her burden, in part, by dissecting Caffery's stated reasons for

the company's actions and challenging Caffery's conclusions. Gallops relies on <u>Howard v. BP</u>

<u>Oil Co., Inc.,</u> 32 F.3d 520 (11th Cir. 1994) for the proposition that "the identification of

inconsistencies in the defendant's testimony [is] sufficient evidence of pretext."[17] What

<u>Howard</u> states, however, is that:

> . . . the identification of a defendant's inconsistent statements has evidentiary
> value; mere denial of credibility has none. Under <u>St. Mary's,</u> a plaintiff
> withstands summary judgment adjudication by producing sufficient evidence to
> allow a reasonable finder of fact to conclude that the defendant's articulated
> reasons for its decision are not believable. Such evidence may consist of a
> defendant's inconsistent statements.

<u>Howard,</u> 32 F.3d at 526.

Inconsistencies, therefore, may lead to a showing of discriminatory intent but are not

an end to a showing of discrimination by themselves. Moreover, Gallops' reliance on the

<u>Howard</u> case is misplaced because the Eleventh Circuit recently limited that ruling's

application to its own facts. <u>Isenbergh v. Knight-Ridder Newspaper,</u> 97 F.3d 436 (11th Cir.

---

[17] Plaintiff's Brief in Opposition to Defendants' [sic] Motion for Summary Judgment p.7.

1996)[18]Further, the <u>Howard</u> decision led to what the Eleventh Circuit described as confusion about whether judgments as a matter of law are always precluded "whenever there is a plausible basis on which to disbelieve the employer's proffered reason for the employment decision in question." <u>Isenbergh</u>, 97 F.3d at 441 (11th Cir. 1996). In addressing this situation, the Eleventh Circuit stated:

> We doubt that <u>Howard's</u> words are supported by the reasoning of Justice Scalia's opinion for the Court in [St. Mary's Honor Center v. Hicks], and we believe that Howard is mistaken when it reads <u>Hicks</u> as controlling kinds of cases that were not before the court in <u>Hicks</u>. Again, <u>Hicks</u> only held that a judge may, after a bench trial, disbelieve the employer's proffered reason for a hiring decision and yet still grant judgment to the employer. <u>Hicks</u>, 509 U.S. at 508-11, 113 S. Ct. at 2748-49. So, despite the <u>Hicks</u> language quoted above, we have no confidence that the <u>Hicks</u> decision dictates to circuit and district judges, or even was intended to suggest, that every time the evidentiary record in a case could support a jury's disbelief of the employer's explanation for the pertinent employment action, no court may grant a motion for judgment as a matter of law to the employer (or grant to an employer summary judgment) in an employment discrimination case. In our view, <u>Hicks</u>, taken as a whole, more likely supports a different conclusion: in such circumstances, the watchword would be not "every time," but "sometimes."

<u>Isenbergh</u>, 97 F.3d at 442.

The court then specified what type of evidence a plaintiff must produce at the summary judgment stage:

> In the discrimination context, we have stated that it bears repeating that a mere scintilla of evidence does not create a jury question . . . And, in considering whether a plaintiff has presented a jury question on pretext, we have required that the plaintiff point to facts which, if true, would present a basis for the disbelief of the defendant's overall justification. That the plaintiff calls into question some assertions made by the defendant in support of defendant's justification is not enough. The plaintiff must call into question the veracity of the defendant's ultimate justification itself.

---

[18] "If Howard was purporting to set out a legal principle that had application beyond its own facts, Howard seems inconsistent in this regard with the holding in, at least, <u>Walker v. NationsBank</u>

Isenbergh, 97 F.3d at 444.

The paramount inquiry therefore remains whether the plaintiff has shown that the defendant intentionally discriminated based on age. Further, the employer may be entitled to summary judgment if it produces extensive evidence of legitimate and nondiscriminatory reasons for the employment action. To survive a summary judgment motion, the plaintiff must then present concrete evidence in the form of specific facts that show that the defendant's proffered reason is mere pretext. Most important, the plaintiff always bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence. The fact that the employer's decision is unfair is inadequate to survive a properly supported summary judgment motion. Generally, courts have no authority to second guess managerial decisions made in good faith.[19]

The court concludes that Gallops has met her prima facie case and that Avondale has proffered legitimate, nondiscriminatory reasons for its actions. Avondale's evidence is quite strong and border on erasing any inference of pretext. Viewing the totality of the circumstances, however, the court cannot conclude, as a matter of law, that age was not a motivation behind Avondale's decisions. The evidence shows that Gallops was making $55,000 in the Sylacauga Stylist position. Regardless of how either party characterizes the action, Avondale eliminated the Stylist position and, at some point that month, offered Gallops a Pattern Technician position that paid $10,000 less. The evidence also reflects that

---

[19] The litany of cases should, by now, be familiar. However, see generally Isenbergh v. Knight-Ridder Newspaper, 97 F.3d 436 (11th Cir. 1996); Brown v. American Honda Motor Co., 939 F.2d 946 (11th Cir. 1991); Carter v. City of Miami, 870 F.2d 578 (11th Cir. 1989); Young v. General Foods Corp., 840 F.2d 825 (11th Cir. 1988); Hudson v. Southern Ductile Casting Corp., 849 F.2d 1372 (11th Cir. 1988); Pace v. Southern Ry. System, 701 F.2d 1383 (11th Cir. 1983).

16

Avondale no longer allowed her to have direct client contact, travel, or make presentation.
Despite protesting the move, Gallops asserts, Hudson, Caffery, and Hull told her that she
could do nothing about the situation. Gallops even signed off on her new job description
specifically noting that Avondale was discriminating against her based on age.

That same month, Avondale named the younger Testa as the new Design Manager in
New York - a job Gallops purportedly desired. Gallops claims, moreover, that Caffery knew
nothing about Gallops' background and experience and ignored former supervisors' excellent
reviews of her. Viewing this evidence together with the events earlier in the month creates a
sufficient basis for Gallops to proceed. While the question may be close, the court will not
grant summary judgment on this claim.

### 4. Retaliation

Again, Gallops charges that Avondale's stated reasons for firing Gallops' are
pretextual. Gallops argues, in essence, that she could have continued to do the Pattern
Technicians' duties from Sylacauga after Russell Mills closed, thus foreclosing the necessity to
move the job to New York. Her argument is as follows:

> "Clearly, the defendants lack of any concerted efforts to investigate, research
> or obtain any kind of working knowledge regarding what was required for the
> performance of . . . Gallops [sic] job prior to determining that she needed to be
> transferred to New York to perform those tasks, creates a genuine issue of
> material fact as to whether this proposed legitimate, nondiscriminatory reason
> was merely a pretext.

Plaintiffs Brief in Opposition to Defendants' [sic] Motion for Summary Judgment,

p.26. The court, however, concludes differently.

Gallops does not furnish evidence that raises a suspicion of falsehood sufficient to
allow her to continue her claim that the bank retaliated against her. "The ultimate question

17

[is] [retaliation] vel non." St. Mary's Honor Center v. Hicks, 113 S. Ct. at 2753. Further, "[w]hile an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal [retaliation]." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (1984).

Gallops also contends that Avondale offered her two other jobs to cover up the company's retaliation. She claims that the company knew she would not take such a "drastic demotion" after exercising "tremendous responsibilities" and, thus, the offer was "simply and [sic] empty gesture."[20] Gallops argues that she has provided the requisite causal link required to show retaliation. The court disagrees. No causal link is made to retaliation. Conclusory allegations and merely colorable assumptions are insufficient to establish a prima facie case of retaliation. Accordingly, summary judgment will be granted on this claim.

## II. GENDER DISCRIMINATION CLAIMS

The court will only briefly discuss Gallops' gender discrimination claims because she cannot establish a prima facie case.[21] A plaintiff establishes her prima facie case of gender discrimination by proving that (1) she is a member of a protected class, (2) she applied for and was qualified for a job for which the defendant was seeking applicants, (3) despite her qualifications, she was rejected, and (4) the defendant gave the position to a person who was not a member of a protected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802,

---

[20] Quoting Batey v. Stone, 24 F.3d 1330 (11th Cir. 1994).

[21] The gender claim is baseless. It is typical of the attempt to make claims based on every protected category of which a plaintiff is a member.

93 S. Ct. 1817, 1824, 36 L. Ed.2d 668 (1973); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).

Gallops has failed to establish a prima facie case because Avondale did not award either disputed position that Gallops claims to have sought to a person outside the protected class - in this case, female. The company awarded both the Director of Marketing Services and the Design Manager positions to other females. Without the requisite showing that the job went to a male or other member outside the protected class the court must grant judgment as a matter of law. See Green v. School Board of Hillsborough County, 25 F.3d 974, 978-79 (11th Cir. 1994).

Gallops also contends that Avondale gave male employees benefits and luxuries not provided to the female employees. Specifically, she claims that Avondale did not allow her and other females to participate in the bonus program until approximately 1992. Avondale argues, and the court agrees, that Gallops failed to identify this claim before her Brief in Opposition to Defendant's Motion for Summary Judgment and, as such, cannot now pursue it. The only conceivable reference to this claim appears in Gallops' Complaint where she states:

> 18. Plaintiff has been discriminated against on the basis of age and sex in the area of statue, pay, demotion, promotion and other privileges, terms and conditions of her employment in violation of the Age Discrimination Act and Title VII. Many of the changes in plaintiff's job responsibilities and duties resulted in loss of status and in her performing menial tasks.

The facts underlying this conclusory claim are not specified elsewhere in the complaint. Neither is the claim specified in any other pleading nor other court filings from Gallops. Moreover, the Complaint paragraph cited is more like a blanket generic allegation generally pled before discovery occurs. In the present case, however, extensive discovery

19

materials exist without any mention of the claim. There is also a lack of any specific indication of the claim in Gallop's own EEOC charges[22], affidavit, and deposition testimony.[23] The court concludes that before November 20, 1996, the date Gallops submitted her brief, this issue was not raised. The memorandum of law that Gallops submitted in support of the motion does not suffice to supply the requisite basis for the claim.[24] Accordingly, summary judgment will be granted on plaintiff's gender discrimination claims.

This the 29 day of Jan, 1997.

---

[22] Gallops' January 18, 1995 EEOC charge states in blanket fashion: "I believe I have been discriminated against on the basis of age in the area of status, pay, demotion, promotion and other privileges, terms and conditions of my employment in violation of the Age Discrimination Act."

[23] Gallops does, however, make the following reference to the company's bonus program when discussing Caffery:

Q. Look down further on that page -- page 13 in your notes there -- and you'll see that you made a statement to this effect: "I get no monetary gain; she does as a recipient of the bonus program." You were not on the bonus program; is that correct?

A. No.

Q. And you were unhappy about that; is that correct?

A. I felt like I deserved to be.

Q. Were any of the other designers on the bonus program, to your knowledge?

A. Not to my knowledge.

Deposition of Maureen S. Gallops, Vol. I of II, p.124. Interestingly, Gallops also testified that she once received a $1,000 bonus from Avondale. Deposition of Maureen S. Gallops, Vol. II of II, p.201.

[24] See Helmich v. Kennedy, 796 F.2d 1441, 1443 (11th Cir. 1986). Moreover, Avondale notes that the only persons who participated in the bonus program were at senior management levels and, as such, were not similarly situated to Gallops. While not ruling on this particular argument, the court finds the contention persuasive.

Robert B. Propst
Senior United States District Judge

21